UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TY EVANS, | ) | |
| | ) | |
| Petitioner, | ) | |
| v. | ) | No. 1:13-cv-634-JMS-MJD |
| | ) | |
| DUSHAN ZATECKY, | ) | |
| | ) | |
| Respondent. | ) | |

**Entry Discussing Petition for Writ of Habeas
Corpus and Denying Certificate of Appealability**

For the reasons explained in this Entry, the petition of Ty Evans for a writ of habeas corpus must be denied and the action dismissed with prejudice. In addition, the court finds that a certificate of appealability should not issue.

**The Petition for Writ of Habeas Corpus**

**I. Background**

Evans is serving the executed portion of sentences imposed following his convictions in an Indiana state court for attempted murder, resisting law enforcement and habitual offender enhancement. *See Evans v. State*, 855 N.E.2d 378 (Ind.Ct.App. 2006) ("*Evans I*"). Evans' convictions and sentence were affirmed in *Evans I*, and the Indiana Supreme Court denied his petition for transfer on February 15, 2007. The trial court's subsequent denial of a petition for post-conviction relief was affirmed on appeal in *Evans v. State*, No. 49A04-1112-PC-697 (Ind.Ct.App. Aug. 8, 2012) ("*Evans II*").  The Indiana Supreme Court denied Evans' petition for transfer on February 15, 2013. The evidence supporting the jury's verdicts was summarized as follows:

> Evans occasionally paid nineteen-year-old Melinda Keedy to clean his house, do his laundry, and care for his yard. Keedy kept all her belongings at Evans's home

and sometimes stayed there. Evans and Keedy were also partners in a scheme to commit bank fraud in Tennessee and Kentucky. Evans created false identity papers for Keedy that she used to open a bank account as well as checks that Keedy deposited in that bank account. He created these checks by stealing mail from mailboxes and copying information from the checks he found therein. Keedy would deposit or cash the checks created by Evans using a false thumbprint. However, in early May 2005, Keedy used her actual thumbprint to cash a check. When she informed Evans that she had done so, he became very angry. Evans was afraid the police would catch them, and he decided to kill Keedy.

On May 15, 2005, Evans contacted his friend and employee, Billy Neely, and offered him an unspecified job for which Neely could earn three or four thousand dollars. On May 16, 2005, Neely went to Evans's house. Evans then told Neely that he wanted to kill Keedy, whom Neely also knew. Evans explained the plan to Neely: Evans had told Keedy that he was going to rob a house in Geist that night, and Keedy had agreed to drive him. Keedy was to meet Evans at a grocery store where he would pick her up. After Evans picked up Keedy, he would bring her back to his house, where Neely would be waiting. Once inside the house, Evans would strangle Keedy with a rope while Neely remained ready to apprehend Keedy should she attempt to escape. Evans would wash the body in a wading pool to remove any evidence and place it in a box, both of which he had in his garage. Finally, Neely would bury Keedy in an excavation for a new house. After explaining the plan, Evans drove Neely to the construction site where Neely was to bury Keedy. They then returned to Evans's house, and Neely waited there while Evans picked up Keedy.

Evans, however, was unaware that Keedy had agreed to act as a police informant. A few days earlier, Ryan Stephenson, Keedy's intermittent boyfriend, had contacted United States Postal Inspector Richard Petry and provided him with information regarding Evans and Keedy's bank fraud scheme. On May 16, 2005, at approximately 5:00 p.m., Inspector Petry learned of Keedy's location, and Indianapolis police officers pulled Keedy over. Keedy admitted her involvement in the bank fraud scheme and agreed to accompany Inspector Petry to his office for an interview. On the way to Inspector Petry's office, Keedy told him about the robbery she was to help Evans with that very evening. Inspector Petry immediately stopped his car and contacted the Indianapolis Police Department. Keedy drove with police officers to the home that she thought Evans had targeted for the robbery. The police formulated a plan wherein Keedy would meet Evans as planned, and while under police surveillance, they would drive to the Geist home, and the officers would interrupt the robbery before it occurred. Keedy agreed to wear a wire. The police put the wire on Keedy, and she went to meet Evans at the grocery store.

At approximately 7:30 p.m., Keedy arrived at the grocery store parking lot. Evans was waiting there as planned. Keedy got in his car, but Evans did not drive to the Geist house. Instead, he drove to his house, explaining to Keedy that he had to get

2

his gun. Evans parked his car in his garage and closed the garage door. Just before she exited the car, Keedy saw Evans put a glove on his left hand. She entered the house in front of Evans. After she had taken a step or two, Evans put a rope around her neck, started strangling her, pulled her to the ground, and said: "You robbed the wrong motherfucker this time, didn't ya? $2,000 out of my dresser. It's all over with bitch. You can't be trusted. About two minutes, it'll be all over. This ain't no game. .... You were told." State's Exhibits 10, 11. Neely was also in the house and made derogatory comments to Keedy. Evans continued, saying, "Yeah, you were told time and time again to keep your ... mouth shut." *Id.*

Meanwhile, the police officers monitoring the transmission from Keedy's wire realized something was wrong and attempted to enter the house. Evans's house had two doors. Some officers ran to the front door, while Officers Jeffrey Krider, Dewey Poskon, and Jeffrey Avington ran to the side door. Next to the side door, there was a full-length window approximately three feet wide. Officer Poskon looked in the window and saw a pool table. On the other side of the pool table, he saw two pairs of legs, perpendicular to each other. One set of legs was bare, and the other set had on light blue jeans. Officer Poskon yelled, "They're in there." Tr. at 235. The officers yelled, "Police," and tried to open the door, but it was locked. *Id.* at 244. Officer Avington attempted to kick the door open three times, but it would not open. Evans came to the window and said that he could not open the door. Officer Avington kicked the door once more, and it opened. He rushed in and ran after Neely, who had jumped over the banister and run up the stairs. Neely had on a hooded sweatshirt, brown work pants, and brown boots. Neely ran to the front door and unlocked it, allowing the officers there to enter. After the officers subdued Neely, Officer Avington returned to the room in which Keedy lay.

Meanwhile, Officer Krider had knocked Evans down. Evans was wearing light blue jeans. Officer Krider attempted to subdue Evans, who continued to fight. Evans was face down and was kicking and bucking while Officer Krider was on his back. Officer Poskon went to the other side of the pool table and saw Keedy face down with her head in the fireplace. He yelled for an ambulance and then went to assist Officer Krider in subduing Evans. Having returned to the room, Officer Avington went to help Keedy. He turned her over and removed the rope from around her neck. She had blood on her face and was foaming at the mouth; her eyes were rolled back in her head; and she had urinated on herself. He was unsure whether she was dead or alive. After a few seconds, Keedy gasped and started to cough and moan. Her face was "cherry red" due to the extensive hemorrhaging, she had an abrasion on her neck from the rope, her voice was raspy and hoarse, she was gasping for breath and hyperventilating, and she had difficulty swallowing. *Id.* at 468. However, she was able to indicate that Evans was the person who had attempted to strangle her. At some point, the police were able to handcuff Evans.

Police found two gloves in the room and two other gloves that Neely had dropped as he attempted to flee. Inside Evans's garage, police found a small wading pool, a box large enough to hold a grown adult, a bottle of acid, a bottle of 409 spray, three bottles of isopropyl alcohol, and two packs of disposable rubber gloves. In Evans's car, police found two bags of ready mix concrete, a shovel, a pick ax, a big heavy-duty trash bag, a towel, and a complete change of clothes. A brown paper grocery bag was taped over the overhead dome light. Neely showed police the construction site where he was supposed to bury Keedy's body.

On May 18, 2005, the State charged Evans with class A felony attempted murder, class B felony aggravated battery, class B felony criminal confinement, and class D felony resisting law enforcement. On October 12, 2005, the State amended the information to include a habitual offender charge.

*Evans I*, 855 N.E.2d at 381-383.

## II. Applicable Law

A federal court may grant habeas relief only if the petitioner demonstrates that he is in custody "in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2254(a) (1996). Under the current regime governing federal habeas corpus for state prison inmates, the inmate must show, so far as bears on this case, that the state court which convicted him unreasonably applied a federal doctrine declared by the United States Supreme Court." *Redmond v. Kingston,* 240 F.3d 590 (7th Cir. 2001) (citing 28 U.S.C. § 2254(d)(1); *Williams v. Taylor,* 529 U.S. 362 (2000); *Morgan v. Krenke,* 232 F.3d 562 (7th Cir. 2000). "The habeas applicant has the burden of proof to show that the application of federal law was unreasonable." *Harding v. Sternes,* 380 F.3d 1034, 1043 (7th Cir. 2004)(citing *Woodford v. Visciotti,* 537 U.S. 19, 25 (2002)).

## III. Discussion

### A. Procedural Default

"[W]hen examining a habeas corpus petition, the first duty of a district court . . . is to examine the procedural status of the cause of action." *United States ex rel. Simmons v. Gramley,*

915 F.2d 1128, 1132 (7th Cir. 1990). That examination should entail two inquiries: "whether the petitioner exhausted all available state remedies and whether the petitioner raised all his claims during the course of the state proceedings." *Henderson v. Thieret,* 859 F.2d 492, 496 (7th Cir. 1988), *cert. denied,* 109 S. Ct. 1648 (1989). "If the answer to either . . . inquir[y] is `no,' the petition is barred either for failure to exhaust state remedies or for procedural default." *Id.*

Two of Evans' habeas claims are that: 1) the trial court erred in instructing the jury on accomplice liability; and 2) the state destroyed material exculpatory evidence by altering an audio recording.

As to the first of these claims, Evans did not present this claim of instructional error in *Evans I* as a freestanding claim. Instead, Evans only presented this claim during post-conviction through his ineffective assistance of trial counsel claims. As to Evans' claim that the state destroyed material exculpatory evidence by altering an audio recording, the Indiana Court of Appeals explained that Evans waived this claim by not raising it on direct appeal because it was known to him at the time of trial and available to him on direct appeal. *Evans II*, at p.7. Evans' failure to present these claims on direct review amounts to procedural default.  The finding of procedural default in this case rests on established Indiana law holding that issues not presented on direct appeal and relief are barred by procedural default. *See Lane v. Richards,* 957 F.2d 363, 366 (7th Cir.), *cert. denied,* 113 S. Ct. 127 (1992). The rule is this:

> A post-conviction relief proceeding is not a substitute for trial and appeal, but is a process for raising issues that were unknown or not available at trial. *Davidson v. State,* 763 N.E.2d 441, 443 (Ind. 2002). If an issue was available on direct appeal but not litigated, it is deemed waived. *Madden v. State,* 656 N.E.2d 524, 526 (Ind.Ct.App. 1995).

*Conner v. Anderson*, 259 F.Supp.2d 741, 750 (S.D.Ind. 2003)(quoting *Smith v. State,* 774 N.E.2d 1021, 1022 (Ind.Ct.App. 2002)). Here, Evans does not overcome the procedural default of his

5

claims, and therefore, he is not entitled to relief on these claims.  Furthermore, Evans concedes in his traverse that he is not trying to raise any freestanding claim, but instead his claims are all based on ineffective assistance of counsel.

### B. Ineffective Assistance of Counsel

Evans' remaining habeas claims focus on the performance of his attorneys at the guilt phase. The Sixth Amendment guarantees a criminal accused the right to assistance of counsel, and Athe right to counsel is the right to the effective assistance of counsel.@ *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). This guarantee exists "in order to protect the fundamental right to a fair trial." *Strickland v. Washington,* 466 U.S. 668, 684 (1984).

The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland,* 466 U.S. at 686. This standard requires a two-part inquiry. "To prevail on an ineffective-assistance[-]of-counsel claim under *Strickland,* a petitioner must demonstrate that his counsel's assistance was objectively unreasonable and resulted in a substantial risk of prejudice." *Brown v. Finnan,* 598 F.3d 416, 419 (7th Cir. 2010).

Deficient performance is "measured against an objective standard of reasonableness, under prevailing professional norms." *Rompilla v. Beard,* 545 U.S. 374, 380 (2005) (citations omitted). In making this determination, the court considers "the reasonableness of counsel's conduct in the context of the case as a whole, viewed at the time of the conduct . . . ." *United States v. Lindsey,* 157 F.3d 532, 534–535 (7th Cir. 1998); *see also Hough v. Anderson,* 272 F.3d 878, 891 (7th Cir. 2001) (holding that the court must consider the totality of the evidence before the judge). There is a strong presumption that "any decisions by counsel fall within a wide range of reasonable trial strategies." *United States v. Lindsey,* 157 F.3d at 534–35. "To state the

obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" *Chandler v. United States,* 218 F.3d 1305, 1313 (11th Cir. 2000) (quoting *Burger v. Kemp,* 483 U.S. 776, 794 (1987)). "There are countless ways to provide effective as assistance in any given case." *Strickland,* 466 U.S. at 689. There comes a point where a defense attorney will reasonably decide that another strategy is in order, thus "mak[ing] particular investigations unnecessary." *Id.,* at 691.

To establish prejudice, the defendant must demonstrate that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different,' meaning 'a probability sufficient to undermine confidence in the outcome.'" *Eckstein v. Kingston,* 460 F.3d 844, 849 (7th Cir. 2006) (*quoting Strickland,* 466 U.S. at 694). To establish prejudice under the second prong, "the unprofessional errors of counsel must be so egregious 'that the trial was rendered unfair and the verdict rendered suspect.'" *Rodriguez v. United States,* 286 F.3d 972, 983 (7th Cir. 2002) (citation omitted).

The foregoing outlines the straightforward features of *Strickland*s two-prong test. In the context of a case such as Evans presents, however, the AEDPA raises the bar. "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (internal and end citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

When the AEDPA standard is applied to a *Strickland* claim, therefore, the following calculus emerges:

> The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable-a substantially higher threshold. And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance,* 129 S. Ct. 1411, 1420 (2009)(internal citations and quotations omitted). In applying AEDPA's "difficult to meet . . . and highly deferential standard," we must give the Indiana Court of Appeals' decisions "the benefit of the doubt." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (internal quotation marks and citations omitted).

"Ineffective assistance of counsel is a single ground for relief no matter how many failings the lawyer may have displayed. *Pole v. Randolph,* 570 F.3d 922, 934 (7th Cir. 2009) (citing *Peoples v. United States,* 403 F.3d 844, 848 (7th Cir. 2005)). Thus, *Strickland* requires that counsel=s performance be evaluated as a whole rather than focus on a single failing or oversight. *Peoples v. United States,* 403 F.3d 844, 848 (7th Cir. 2005); *Williams v. Lemmon,* 557 F.3d 534, 538 (7th Cir. 2009)("It is essential to evaluate the entire course of the defense, because the question is not whether the lawyer's work was error-free, or the best possible approach, or even an average one.")

Evans claims that his trial counsel rendered ineffective assistance by failing to: 1) object to the accomplice liability instruction; 2) ensure that the audio recording was tested for authenticity; 3) have evidence that Evans was involved in a bank fraud scheme with Keedy excluded; 4) impeach Neely; and 5) call a linguistic forensics expert to testify that the recording proves Neely was an assailant.

*Accomplice liability instruction*: Evans argues that his counsel rendered ineffective assistance by allowing the jury to receive an erroneous instruction on accomplice liability as to the attempted murder charge. Notwithstanding the deficient performance prong of *Strickland,* to

prevail on this claim Evans must also show prejudice. This means, as already explained, that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. The weight of the evidence is a key consideration in conducting the prejudice inquiry under *Strickland.* 466 U.S. at 695-96. As set forth on Evans' direct appeal,

> [T]he State presented overwhelming evidence of Evans's guilt. Keedy and Neely presented eyewitness testimony, which was corroborated by the circumstantial evidence; the police interrupted the crime while it was being committed, so there was no issue as to Evans's identity or involvement; and the crime was recorded by means of Keedy's wire transmission, which was presented to the jury. Under these circumstances, the probable persuasive effect of Keedy's comment on the jury is insignificant.

*Evans I* at 386. At Evans' post-conviction appeal, the Indiana Court of Appeals noted the *Strickland* standard, *Evans II,* at pp. 7-8, and determined that it was irrelevant how the jury was instructed in this instance because "the State's evidence overwhelmingly showed that Evans was the principal in Keedy's attempted murder." *Evans II,* at p.13. Here, the Indiana Court of Appeals considered the weight of the evidence in conducting the prejudice analysis, and neither its methodology nor its decision was an objectively unreasonable application of *Strickland's* prejudice prong.

*Audio Recording Tested for Authenticity*: Evans claims that his counsel rendered ineffective assistance by not having the audio recording tested for authenticity. This issue was not presented to the Indiana Court of Appeals in Evans' petition to transfer following issuance of *Evans II*. This shortcoming constitutes his procedural default. *O'Sullivan v. Boerckel,* 526 U.S. 838, 848 (1999). Evans has not shown the presence of circumstances permitting him to overcome this default, and hence the court is not permitted to reach the merits of this claim.

*Evidence that Evans was not involved in a bank fraud scheme with Keedy:* Evans claims that his counsel was ineffective in not introducing evidence that Evans was not involved in a bank fraud scheme with Keedy. The Indiana Court of Appeals explained, "Evans does not refute the post-conviction court's assessment of his counsel's strategy but, instead, merely reiterates his claim that this decision was prejudicial to him." *Evans II* at pp.12-13.

*Impeachment of Neely and Linguistics Forensics Expert:* Evans claims that his trial counsel neither cross-examined Neely regarding his purported view through the window nor did he have a linguistic forensics expert testify that the audio recordings prove that Neely was the assailant. The Indiana Court of Appeals recognized the *Strickland* standard, reviewed these claims and explained:

> His counsel's main theory of defense *was* an identity defense, namely, that either Evans was not the person who strangled Keedy or, at the very least, that the State did not prove beyond a reasonable doubt that he was. Thus, we agree with the State that 'what [Evans] really seems to be arguing is that counsel should have presented this defense in a more persuasive manner.' Appellee's Br. at 25. To that end, we note that Evans' trial counsel questioned the witnesses regarding their view through the window and the color of Neely's pants; they thoroughly impeached Keedy; and they questioned how well a listener could tell who was who in the wire recording. Counsel can only do so much. We will not nitpick their tactics and strategy.

*Evans II*, at pp.10-11. It should be noted that, "while in some instances 'even an isolated error' can support an ineffective-assistance claim if it is 'sufficiently egregious and prejudicial,' *Murray v. Carrier,* 477 U.S. 478, 496 (1986), it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy. *Harrington v. Richter,* 131 S. Ct. 770, 791 (2011).*; see also Miller v. Secretary, Department of Corrections*, 2009 WL 2436075, at *11 (M.D.Fla. Jul. 31, 2009). That is precisely the nature of Evans' defense. There was in the Indiana Court of Appeals' analysis in *Evans II* no decision "contrary to" clearly established Federal law as determined by the Supreme Court of the United States.

Similarly, this decision—in which the Indiana Court of Appeals concluded that Evans had failed to show either deficient performance of counsel or prejudice—was not an unreasonable application of *Strickland* because the Indiana Court of Appeals "took the constitutional standard seriously and produced an answer within the range of defensible positions." *Mendiola v. Schomig,* 224 F.3d 589, 591 (7th Cir. 2000).  As noted in *United States v. Farr,* 297 F.3d 651, 658 (7th Cir. 2002):

> We have observed in the past that criminal defendants frequently "demonize" their lawyers. "If we are to believe the briefs filed by appellate lawyers, the only reasons defendants are convicted is the bumbling of their predecessors. But lawyers are not miracle workers.  Most convictions follow ineluctably from the defendants' illegal deeds."

Because this court cannot find that the Indiana Court of Appeals "unreasonably applie[d] [the *Strickland* standard] to the facts of the case," Evans' claim of ineffective assistance of counsel at trial does not support the award of habeas corpus relief. *Murrell v. Frank,* 332 F.3d at 1111 (citing *Bell v. Cone,* 535 U.S. 685, 694 (2002)).

### IV. Conclusion

"[H]abeas corpus has its own peculiar set of hurdles a petitioner must clear before his claim is properly presented to the district court." *Keeney v. Tamayo-Reyes,* 504 U.S. 1, 14 (1992) (O'Connor, J., dissenting) (internal citations omitted). In this case, Evans has encountered the hurdle of the doctrine of procedural default as to two of his claims. He has not shown the existence of circumstances permitting him to overcome these hurdles, and hence is not entitled to the relief he seeks as to those claims.

As to Evans' remaining ineffective assistance of counsel claims, this court has carefully reviewed the state record in light of Evans' claim and has given such consideration to that claim as the limited scope of its review in a habeas corpus proceeding permits. The deference due to

state court decisions "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter,* 131 S. Ct. 770, 786 (2011). Evans' habeas petition does not present such a situation.

Evans' petition for a writ of habeas corpus [1] is therefore **denied.** Judgment consistent with this Entry shall now issue.

## Certificate of Appealability

## II.

Pursuant to Federal Rule of Appellate Procedure 22(b), Rule 11(a) of the Rules Governing ' 2254 proceedings, and 28 U.S.C. ' 2253(c), the court finds that Evans has failed to show that reasonable jurists would find Åit debatable whether the petition states a valid claim of the denial of a constitutional right@ and Ådebatable whether [this court] was correct in its procedural ruling.@ *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). The court therefore **denies** a certificate of appealability.

**IT IS SO ORDERED.**

Date:  02/27/2014

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

Ty Evans
#158293
Pendleton Correctional Facility
Inmate Mail/Parcels
4490 West Reformatory Road
Pendleton, IN 46064

Electronically Registered Counsel